# EXHIBIT B

Anthony M. Nicastro
KNIGHT NICASTRO MACKAY, LLC
27 Shiloh Road, Suite 10
Billings, Montana 59106
Telephone: (406) 545-2031
Facsimile: (816) 396-6233
nicastro@knightnicastro.com
*Attorney for Plaintiff*
*BNSF Railway Company*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| BNSF RAILWAY COMPANY, | No. CV 24-81-BLG-SPW-TJC |
| Plaintiff, | |
| v. | **PLAINTIFF BNSF RAILWAY COMPANY'S DISCLOSURE OF EXPERT WITNESSES** |
| CITY OF GLENDIVE, | |
| Defendant. | |

Pursuant to FRCP 26, the Court's Scheduling Order, and agreement between the parties, BNSF Railway Company ("BNSF") hereby makes the following initial liability and damages expert witness disclosures:

**Al Kostelnik**, Principal Engineer, Arcadis, Choteau, Montana, will be called as an expert on industrial wastewater/sanitary sewer discharges and conveyances including, but not limited to, sampling procedures and as disclosed more completely in his report attached at **Exhibit A**, which includes his resume and statement of compensation. Mr. Kostelnik has not provided any deposition or trial testimony in the last four years. He may use any documents provided in discovery as exhibits, as

well as demonstrative exhibits. He may further be called to rebut and/or evaluate any expert opinions offered by Defendant.

BNSF identifies the following fact witnesses below out of an abundance of caution to the extent any factual testimony may be deemed opinion testimony in accordance with the requirements of FRE 701 given each witnesses' special education, knowledge, skill and experience. They are not specially retained experts for this litigation and their duties do not involve regularly testifying.

1. **Matt Richardson**, Pinnacle Engineering, Bismarck, North Dakota.

Mr. Richardson has personal factual knowledge aided by his special knowledge, skill and experience relating to environmental work Pinnacle performed for BNSF at the Glendive Railyard. In addition to a Bachelor of Science Degree in Biology, Mr. Richardson has worked on environmental projects for industrial clients for many years including compliance, emergency response and remediation-related projects. Mr. Richardson may offer testimony on facts and opinions relating to this work with respect to the prior industrial wastewater (IWW) discharge agreement with the City and operations thereunder, interactions with the City Public Works employees in-relation to the prior IWW agreement and BNSF's attempts to obtain a new IWW agreement, BNSF's investigations and efforts to work with the City following the City's unilateral termination of BNSF's connection to the sanitary

sewer at E. Valentine and S. Pearson, and the City Manhole at East Valentine/S. Pearson Avenue, and BNSF's response to the City's June 5, 2024 report that City contractors had crushed piping that emanated from the BNSF Glendive Railyard. Mr. Richardson may also offer testimony and opinions relating to his personal observations of conditions in the BNSF Glendive Work Equipment Building based on his visits to this building, observations of BNSF manholes between the Work Equipment Building and the City Manhole at East Valentine and South Pearson. Mr. Richardson may also offer testimony and opinion based on his personal factual knowledge aided by his special knowledge, skill and experience of costs incurred by BNSF with Pinnacle were reasonable and necessary to establish temporary sanitary facilities for workers in the Work Equipment Building, costs BNSF incurred with Pinnacle for repairs/upgrades made to the sanitary sewer line in an effort to reconnect to City services were reasonable and necessary, and the costs BNSF incurred with Pinnacle for the design and installation of an alternative system to provide sanitary sewer to the Work Equipment Building were reasonable and necessary. All such costs as reflected in and supported by Pinnacle Engineering Invoices numbers previously produced in this case including:

- 121084 (BNSF (Glendive) 011123-011128),
- 121085 (BNSF (Glendive) 01129-011132),
- 122203 (BNSF (Glendive) 089062-089065),

- 122141 (BNSF (Glendive) 89066-89071),
- 122107 (BNSF (Glendive) 89072-89074),
- 121464 (BNSF (Glendive) (89103-89106),
- 121761 (BNSF (Glendive) 89077-89095),
- 121652 (BNSF (Glendive) 011141 – 011145),
- 121611 (BNSF (Glendive) 89096-89102),
- 121318 (BNSF (Glendive) 089107-089129),
- 121829 (BNSF (Glendive) 089075-089076),
- 120790 (BNSF (Glendive) 011098-011117),
- 122501 (BNSF (Glendive) 090241-090244), and
- 122720 (BNSF (Glendive) 090245-090247).

**2. Dave Himan,** Senior Civil Technician, Wilson & Co., Omaha, Nebraska.

Mr. Himan has personal knowledge aided by his special knowledge, skill and experience relating to BNSF efforts to repair/upgrade its sanitary sewer line in an effort to reconnect to the City sanitary sewer following the City's unilateral termination of BNSF's connection to the sanitary sewer at E. Valentine and S. Pearson, the identification, necessity and reasonableness of costs BNSF incurred associated with Wilson's work to identify alternatives to reestablish sanitary sewer service to the BNSF Work Equipment Building and the design, installation, and costs of an alternative system to provide sanitary sewer to the Work Equipment Building. All such costs as reflected in and supported by Wilson & Co. invoices produced in this case including invoice numbers:

- 127186 (BNSF (Glendive) 011168),
- 128107 (BNSF (Glendive) 011169),
- 128946 (BNSF (Glendive) 011170 – 011185),

- 129676 (BNSF (Glendive) 089154),
- 130658 (BNSF (Glendive) 089155),
- 131695 (BNSF (Glendive) 011186),
- 132074 (BNSF (Glendive) 011187 – 011213),
- 133030 (BNSF (Glendive) 011214),
- 134457 (BNSF (Glendive) 89156), and
- 126536 (BNSF (Glendive) 011146-011167).

3. **Violet Fisher**, BNSF Manager of Environmental Operations Montana/North Dakota/South Dakota, Helena, Montana.

Ms. Fisher has personal knowledge aided by her special knowledge, skill and experience relating to her environmental work on behalf of BNSF at the Glendive Railyard. Ms. Fisher may offer testimony on facts and opinions relating to the prior industrial wastewater (IWW) discharge agreement with the City and operations thereunder, her interactions with the City Public Works employees in-relation to the prior IWW agreement and BNSF's attempts to obtain a new IWW agreement, as well as her knowledge of BNSF's investigations and efforts to work with the City following the City's unilateral termination of BNSF's connection to the sanitary sewer at E. Valentine and S. Pearson. Ms. Fisher also has personal knowledge of engagement with the Montana Department of Environmental Quality in relation to the matters at issue as identified in the Complaint.

Ms. Fisher's education and experience were disclosed in her deposition in this matter.

4. **Lauren Knickrehm**, BNSF Senior Manager Environmental Remediation Montana/ Wyoming, Whitefish, Montana.

Ms. Knickrehm has personal knowledge aided by her special knowledge, skill and experience relating to environmental work on behalf of BNSF at the Glendive Railyard.  Ms. Knickrehm may offer testimony of facts and opinions regarding BNSF's engagement with the Montana Department of Environmental Quality (MDEQ) in relation to the Glendive Railyard, BNSF's investigations and efforts to work with the City following the City's unilateral suspension or termination of BNSF's connection to the sanitary sewer at E. Valentine and S. Pearson and engagement with MDEQ regarding same, BNSF's response to an anonymous report to the NRC of a "release" on May 4, 2024 to or in the vicinity of the City Manhole at E. Valentine and S. Pearson, and BNSF's response to the City's June 5, 2024 disclosure that City contractors had crushed piping that emanated from the BNSF Glendive Railyard and BNSF's engagement with MDEQ regarding the same.  Ms. Knickrehm may also offer testimony and opinion based on his personal factual knowledge aided by her special knowledge, skill and experience of costs incurred by BNSF as a result of the City's actions (based on invoices produced in this action).

Ms. Knickrehm's education and experience were disclosed in her deposition in this matter.

BNSF reserves the right to name rebuttal experts in accordance with FRCP 26, as well as any witness necessary for impeachment or foundation.  BNSF also reserve the right to identify rebuttal experts whose identity and necessity cannot reasonably be foreseen at this time, or as necessary to rebut previously undisclosed theories from Defendant.

Discovery in this case is ongoing.  BNSF will supplement its expert witness disclosure, as necessary, to reflect additional information gathered in discovery.

DATED this <u>18th</u> day of July, 2025

KNIGHT NICASTRO MACKAY LLC

By: _____
       Anthony M. Nicastro
       *Attorney for Plaintiff*
       *BNSF Railway Company*

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

I hereby certify that on this 18th day of July, 2025, I served the foregoing by

4

email and U.S. mail on the following counsel of record:

5

Adam Warren

6

Keturah Shaules

MOULTON BELLINGHAM PC

7

27 North 27th Street, Suite 1900

8

P.O. Box 2559

Billings, MT 59103-2559

9

Adam.Warren@moultonbellingham.com

10

Keturah.Shaules@moultonbellingham.com

*Attorneys for Defendant*

11

*City of Glendive*

12

13

KNIGHT NICASTRO MACKAY, LLC

14

15

By: _____

16

Anthony M. Nicastro

*Attorneys for Plaintiff*

17

*BNSF Railway Company*

18

19

20

21

22

23

24

25

26



BNSF Railway Company

# Expert Report

## BNSF Glendive, Montana

July 18, 2025

**EXHIBIT A**

# Expert Report

**BNSF Glendive, Montana**

July 18, 2025

**Prepared By:**
Arcadis U.S., Inc.
17 1st St NW
Choteau
Montana 59422
Phone: 406 466 5930

**The opinions expressed here are based on information provided to date. I certify these statements to be true and correct.**

_____

Alois Kostelnik, P.E.
Technical Expert, Mechanical Engineer

Expert Report

# Qualifications

My name is Alois Kostelnik. I am a mechanical engineer at Arcadis U.S., Inc. in Choteau, Montana with 33 years of professional engineering experience. I received my Bachelor of Science in Mechanical Engineering from Montana State University in 1991 and worked at the Hanford Nuclear Reservation in Washington from 1992 to 2000, which included preparing designs for compressed air installations, specifying, and purchasing equipment, and designing equipment for core sampling and other radioactive waste tank operations. I transitioned to providing engineering consulting services in 2000 when I moved back to Montana and began preparing designs for railroad industrial wastewater collection and pre-treatment systems, railroad locomotive and car shop design, and railroad fueling facilities. I am a Registered Professional Engineer in eleven states. My areas of expertise include engineering design, implementation, and testing of industrial fueling and wastewater treatment systems. I have extensive experience in modeling and design management of water, wastewater, and fuel pumping systems, as well as preparation and oversight of engineering design drawings and specifications. I have worked in both the private and public sector and have served as an inspector for the construction of various industrial facilities and supervised treatment and fueling system commissioning to ensure systems operate as designed and meet performance requirements.

As a technical expert I have consistently ensured the effective design, operation, and management of various industrial systems, contributing significantly to the efficient functioning of facilities and compliance with regulatory standards. My resume is attached to this Expert Report (Appendix A).

My compensation is $251.80 per hour. The fee is not contingent on the outcome of the litigation. I have not testified as an expert at trial or by deposition within the last four years.

# Background

BNSF Railway Company (BNSF) operates a railyard in the city of Glendive, Montana (the City). The railyard has been in operation for over a century and is currently owned and operated by BNSF. For business reasons, in 2020 BNSF reduced the level of operations in the railyard and decommissioned many of the buildings that are not necessary to support current operations. The associated utility infrastructure, including electricity, natural gas, water, and sewer, was disconnected from decommissioned buildings.

The Work Equipment Building (Figure 1 *Sanitary and Industrial Line Locations*) is still in operation at the railyard as a shop for maintaining machines that are used to perform maintenance of the tracks. The Work Equipment Building is a large workshop with flat concrete slab floors that houses machines, shelves, tools, a parts washer, and some fluids required for maintenance of the machines. The building is similar to a farmer's shop used for repairing tractors and other farming equipment. The parts washer present in the Work Equipment Building is a self-contained washer that uses a cleanser to clean parts or equipment. The used cleanser and sludge is removed by a vendor who disposes of this material at an off-site disposal facility. The parts washer I observed is similar to a parts washer that a farmer or auto repair shop might use. The Work Equipment Building does not have any pits or drains in the shop area. Attached to the Work Equipment Building is a washroom with sinks, toilets, washing machine, bathroom floor drain, and ice machine. The washroom area has a small basement under it that contains a water heater and disconnected shower, and the washroom drains are easily visible and accessible below the basement ceiling. I observed that this interior plumbing is connected to the sanitary sewer connection exiting the Work Equipment Building wall and that all connections originate from sanitary sources (i.e.,

Expert Report

toilets, sinks, etc.). There is a sump in the corner of the basement with a sump pump, typical of many basements in Montana, which is used to manage the accumulation of water if surface water (i.e., rain or snowmelt) enters the basement or if groundwater levels rise to intruding into the basement. I observed that there were no pipes or drains that discharge to the basement sump.

Until early 2024, an environmental remediation system (remediation system) operated near the Work Equipment Building and used small pumps in several groundwater wells to lower the water table in a small area of the railyard to create a collection point for removing petroleum hydrocarbon products (petroleum products) floating on the water table in this portion of the property (62713-63558 BNSF [Glendive]; 2488-2814 BNSF [Glendive]). The collected petroleum was removed and stored for off-site discharge while the remediation system discharged the pumped groundwater into the City sewer in accordance with a letter granting permission from the City dated July 10, 2002, signed by Wilbur Wallace, the City Public Works Director at that time (11703-11715 BNSF [Glendive]). The operation of these types of remediation systems with permitted discharges to sanitary sewers or surface water bodies is common practice in many cities and states. The authorization of these discharges can be provided by municipal or state entities, depending on the scenario. The pumps associated with the railyard remediation system extract water from several feet below the top of the water table and are installed in an area where petroleum contamination was historically present on the groundwater surface. The system was operated by BNSF's consultant, Kennedy/Jenks Consultants, for periods of several weeks to months per year (depending on groundwater levels) and produced on average approximately 2 to 3 gallons of water per minute. The peak flow rate for each pump was estimated to be 10 to 30 gallons per minute. (For comparison, a typical kitchen faucet discharges approximately 2 gallons per minute at full flow and a typical garden hose discharges approximately 15 gallons per minute at full flow). The railyard remediation system discussed herein was shutdown in February 2024 subsequent to the City's severance of BNSF's connection to the City sanitary sewer system.

The City asserts that on a day in December 2023, "diesel fuel" was observed in the sanitary sewer manhole at the intersection of South Pearson Avenue and East Valentine Street (the manhole in question). The City claims it then acted, without notifying BNSF, by plugging the sewer pipe in the manhole in question with a hydraulic cement product on December 22, 2023. On February 16, 2024, the City claims they inspected the manhole in question and that the plug was not present or intentionally removed. The City then again acted, still without notifying BNSF, on February 16, 2024, by filling the manhole in question with concrete to cover the pipe connection. This effectively and permanently severed BNSF sanitary sewer connection from the Work Equipment Building and the railyard remediation system. Subsequently, BNSF replumbed the sanitary sewer lines in the basement of the Work Equipment Building to drain into two large plastic tanks installed in the basement to maintain working toilet facilities for railyard employees.

# Opinion

**In reviewing the documents** (Appendix B) **and information provided by the City for this case I have seen nothing to suggest the existence of conditions that would warrant immediate termination of the BNSF sanitary sewer connection. Additionally, I have seen no evidence from the City to suggest that the discharge in December 2023 or February 2024 was different in quality or quantity than historical discharges from the railyard as allowed by the City. My conclusions regarding the reasonableness of the City's actions in permanently disconnecting the railyard from the City's sanitary sewer system, without notification to BNSF, is outlined in my opinions presented below.**

Expert Report

# Opinion No. 1

Title V, *Public Works*, Chapter 51, *Sewer and Water Systems*, of the City's Code of Ordinances (Code) includes provisions for addressing discharges of unauthorized materials to the City's sanitary sewer system. Subchapter 99 of Chapter 51, *Penalty*, states: "Any person found to be violating any provision of this chapter shall be served by the city with written notice stating the nature of the violation and providing a reasonable time limit for the satisfactory correction thereof." The City did not follow this requirement and has acknowledged (Defendant's Response to Plaintiffs First Interrogatories and Defendant's Response to Plaintiff's First Request for Admission) that they did not provide any notification to BNSF of their intent to suspend or terminate the BNSF connection to the City's sanitary sewer system.

It is my opinion that the intent of the City's ordinance is to establish a fair and reasonable process to evaluate and resolve a potential discharge that does not comply with City requirements. The process provides the parties with an opportunity to evaluate the conditions and work cooperatively to address any concerns before penalties are imposed, while also securing the City's right to maintain safe and effective sewer operations. Chapter 51 in the City's Code outlines the following protocol for responding to non-compliance:

1. Notice of Violation:
   a. City Code Section 51.99(A), *Penalty: Notice of Violation*, specifies that any person found violating provisions of the chapter will receive written notice stating the nature of the violation and a reasonable time limit for correction.
2. Consequences of Continued Violation:
   a. City Code Section 51.99(B), *Penalty: Misdemeanor*, specifies that continued violations beyond the specified correction period constitute a misdemeanor, punishable by a fine for each day the violation persists.
3. Financial Liability:
   a. City Code Section 51.99(C), *Penalty: Liability for expense, loss or damage*, specifies that violators are liable for any expenses, losses, or damages incurred by the City due to the violation.
4. Disconnection of Service:
   a. City Code Section 51.07(D), *Payment of Charges; Compliance with Rules and Regulations: Noncompliance* specifies that water service to the premises will be discontinued if the customer fails to comply with sewer system rules and regulations 7 days after written notice of violation. Service will not be resumed until past-due bills are paid and compliance is achieved.

BNSF did not receive a Notice of Violation, or any other communication, regarding the purported violation of the City's Code in December 2023 or February 2024. Furthermore, the City did not levy any daily fines to BNSF in response to alleged violations or serve any notification of liability. Throughout the process of severing BNSF's connection to the City sanitary sewer system, the City failed to communicate with BNSF and denied BNSF its right to verify the conditions and undertake corrective action if an issue existed. The City's Code clearly identifies a protocol, and the City did not follow its protocol in this case.

Further, the City contends their actions were taken as some form of "emergency action" (Defendant's Response to Plaintiffs First Interrogatories) but has provided no evidence to support that claim and provided no notification to BNSF after the City claims to have responded to the alleged emergency in December 2023. BNSF is unable to evaluate any of the City's claims regarding the nature of the sanitary sewer discharges to the manhole in question in December 2023 or February 2024 as the City permanently severed BNSF's connection to the City sanitary sewer system without notice and no samples of the discharge were collected by the City prior to its permanent

Expert Report

closure. The City could have considered temporary solutions, such as a temporary plug or shutting down the nearest lift station and contacting BNSF, before pouring concrete into the manhole in question. Had the City notified BNSF of its concerns, BNSF could have implemented additional measures to evaluate discharge water quality and take corrective measures if necessary. These temporary measures would have allowed for a more cautious approach, avoiding excessive and irreversible actions, while still addressing the City's potential concerns. Instead, the discharge warranting emergency action that the City claims to have observed cannot be verified without collection and analysis of samples, which the City's actions have precluded.

# Opinion No. 2

The City's actions in terminating the railyard sewer connection without the collection and submission of samples for laboratory analysis was unreasonable and eliminated the possibility of evaluating or substantiating the City's subjective claim regarding petroleum products entering the City's sanitary sewer system.

When the City was asked to produce sampling results collected by the City (or its agents) or received by the City relating to the manhole in question from June 10, 2020 through present (Dependent's Responses to First Requests for Production, RFP No. 4), the City provided two sample analysis reports with petroleum related analysis for "pipe fluid" and "background soil" collected on June 7, 2024 and additional soil composites collected on June 14, 2024 (CITY 580-715) months after the City's purported observations. The conflicting information provided by the City regarding the date, location, and methodology of sample collection are not consistent with recognized sampling protocols and, in any event, are not representative of what the discharge may have been in December 2023 or February 2024.

On December 22, 2023, the City claims to have installed a temporary plug in the manhole in question, capping BNSF's sanitary sewer connection. Under typical circumstances, sample(s) would be collected for laboratory analysis according to standard methodologies for sample preservation and laboratory submittals (USEPA 2023) – in this case, for oil and grease analysis. However, instead of collecting the proper sample for laboratory analysis of oil and grease or other petroleum products, the City collected a "scoop" of material and put it into a sealable plastic bag (Deposition Transcript-Frank Ceane [June 12, 2025] 121-123). This "scoop" was not preserved or analyzed according to standard sample collection and analysis methods. The City asserts that its staff "knew they were seeing diesel contamination" at the manhole in question (Deposition Transcript-Frank Ceane [June 12, 2025] 149) and this is the explanation provided by the City as to why applicable protocols for sample collection and analysis were not followed. The use of qualitative observations is not a substitute for collecting empirical, quantitative data following sample collection and management best practices.

Because the City did not collect samples for laboratory analysis from the manhole in question prior to severing it from the City's sanitary sewer system; the City acted on unsubstantiated conclusions based on subjective observations regarding appearance and/or odors of an open sewer, rather than relying on quantitative, reproduceable, or reliable evidence collected in accordance with USEPA environmental sampling methodology under standard chain-of-custody procedures (USEPA 2023).

It is important to note that, historically, the City has not identified any violations of its Codes by BNSF, including related to BNSF's historical operations of a railyard industrial wastewater treatment plant (IWWTP) that discharged to the City's sanitary sewer system under an agreement with the City. In reviewing BNSF's IWWTP discharge monitoring reports, which were submitted to the City between 2014 and 2021 (when the IWWTP was decommissioned), there were no exceedances of the permit conditions, and BNSF consistently adhered to the City's regulatory standards (45-2164 BNSF [Glendive]).

Expert Report

# Opinion No. 3

In July 2022, BNSF's consultant, Pinnacle Engineering (Pinnacle) inspected and sampled the manhole in question (89162-89164 BNSF [Glendive]) based on a vague City report from that time (Interview with Violet Fisher [BNSF] on July 8, 2025) of an appearance or odor of petroleum product entering the City's sanitary sewer system. Pinnacle inspected the manhole in question, collected a sample of the water accumulated in the bottom of the manhole, and submitted the sample for laboratory analysis. The laboratory analyzed the sample for oil and grease by United States Environmental Protection Agency (USEPA) Method 1664A, select volatile organic compounds by USEPA Method 8260B, and semi-volatile organic compounds by USEPA Method 3511/8015. These laboratory analytical methods are used to detect petroleum products (including diesel fuel, lube oil, etc.) and non-petroleum hydrocarbons (non-petroleum oils and greases, such as cooking oil) (3-13 BNSF [Glendive]). The laboratory analytical results for the 2022 sample collected from the manhole in question were non-detect for oil and grease and semi-volatile organic compounds, meaning that if any petroleum products were present, they were below the laboratory detection limit. There was a single compound detected, toluene, at an estimated concentration of 0.00742 milligrams per liter, which for reference is well below ecological and human health, including drinking water, standards. This finding demonstrates the disconnect between subjective observations and empirical analyses in confirming the presence or absence of contamination.

It is unreliable in any circumstance to utilize only visual and/or olfactory observations to positively identify contamination with any degree of confidence. The proper collection and analysis of a representative sample by an accredited analytical laboratory is necessary to confirm or disprove any potential contamination with any reasonable degree of confidence.

# Opinion No. 4

The "scoops" of accumulated sludge/water collected by the City or its agents in late 2023 and 2024 were not collected or stored using any recognized environmental sampling methodology and were never submitted to a laboratory for analysis. On December 22, 2023, the City did not secure any samples for analytical testing prior to temporarily capping the manhole in question. Instead, a "scoop" of material was placed into a sealable plastic bag and later discarded. The "scoop" was not photographed or video documented, not preserved for analytical testing, and not retained as evidence (Deposition Transcript-Frank Ceane [June 12, 2025] 121-122). The City repeated this flawed process in February 2024 when it again collected a "scoop" of material which was again was not photographed or video documented, not preserved for analytical testing, and not retained as evidence (Deposition Transcript-Frank Ceane [June 12, 2025] 181-182).

In May 2024, the City or its agents were reportedly installing a water line between the railyard and the manhole in question, located on the corner of South Pearson Avenue and West Valentine Street (Figure 1) when they claimed to have crushed or damaged a pipe full of "diesel fuel and water" (Defendant's Response to Plaintiff's First Request for Admission; CITY 1499). According to the field log dated May 4, 2024, the crew's working limits were from station 427+96 to station 427+14 on West Valentine Street (CITY 1499). During this work, the crew exposed two sewer connections, a 4-inch and a 6-inch diameter pipe, located at station 427+18 and station 427+27, respectively, which is immediately adjacent to the manhole in question (CITY 946-948). The City did not immediately notify BNSF of the alleged contamination, spill, or damage to their piping; instead, BNSF received a notification on June 5, 2024, approximately one month after the pipe had been damaged or crushed, indicating there had been some damage to piping from BNSF property, releasing contamination (BNSF 44 and 089664

Expert Report

[Glendive]). Upon notification from the City, BNSF immediately dispatched its consultant, Pinnacle, to inspect the area, consistent with BNSF standard practice, to evaluate the reported spill and ensure any piping originating on the BNSF railyard was properly capped. Pinnacle arrived on June 5, 2024, the same day BNSF was made aware of an issue by the City.

According to the City's field log dated June 5, 2024 (CITY 1493-1518), while the Pinnacle representative was present the City's agent cut a window into the City sanitary sewer line adjacent to the manhole in question, to facilitate sample collection from the sewer line (CITY 1728, CITY 1734, CITY 1735). The City's agent then severed the sewer pipe, which resulted in a further release of liquid and sludge. Pinnacle and the City's agent each collected liquid samples on June 5, 2024, as recorded in the City's field log dated June 5, 2024 (CITY 1503-1505). Pinnacle's sample was of "pooled material" present in the excavation (BNSF 11276-77 [Glendive]).

The sample collected by the City's agent on June 5 was not submitted for analytical testing (Baranko 0322-0323). Instead, it appears that the City subsequently collected a separate "pipe fluid" sample on June 7, 2024 (CITY 580-605). The City's field log for June 14, 2024 indicates additional soil composite samples were also collected on June 14, 2024 at station 446.64 on South Pearson Avenue. There is no mention of the sampling conducted on June 7, 2024 in the field log for June 7, 2024, presenting unreliability regarding this sample (11276-11277 BNSF [Glendive]).

Regarding sample collection practices, USEPA best practices for sampling wastewater (USEPA 2023) include selecting a sampling location in the wastewater stream where the flow rate promotes adequate mixing. A grab sample should be collected by dipping a laboratory-provided sampling container in the wastewater stream facing upstream and allowing flow to enter the container. When sampling for petroleum products, including oil and grease, the container used to collect the sample contains a preservative and should be sent directly to the laboratory on ice to preserve the integrity of the sample.

The City provided two videos (CITY 1728 and CITY 1734) purportedly showing sample collection taking place on June 5. The City's agent's sampling methods depicted in these videos do not follow industry standards or best practices for wastewater sampling and the results are not representative of the sanitary sewer discharge. Based on a review of the video, the sample containers being used do not appear to be appropriate for some of the analyses performed. The sample containers appear to be unpreserved jars and are being collected by personnel not wearing nitrile gloves, which are intended to minimize the potential for cross-contamination. If the videos cited above are depictions of the sample collection process, then the collection of those samples did not follow industry best practices (EPA 2023), and the results are unreliable. Bottles used to analyze extractable phase hydrocarbons (EPH) by Montana Method EPH should be one-liter amber bottles preserved with hydrochloric acid. Likewise, bottles used to analyze volatile phase hydrocarbons (VPH) by Montana Method VPH should be 40-milliliter volatile organic analyte vials preserved with hydrochloric acid. It is unclear how the samples dated June 7, 2024 were collected as there are no notes, photographs, or videos documenting the process. Furthermore, the laboratory analytical report for samples purportedly collected on that date does not indicate that hydrochloric acid preservatives were used, and the only noted preservative is nitric acid, which is not used for either EPH or VPH analyses.

# Opinion No. 5

The City authorized BNSF's discharge of groundwater from a railyard remediation system to the City's sanitary sewer system. At least as early as 1993, operations, maintenance, and monitoring of this railyard remediation

Expert Report

system was performed under the oversight of the Montana Department of Environmental Quality (DEQ), as documented in reports submitted to DEQ (2488-2814 BNSF [Glendive]).

In a letter dated July 10, 2002, the City re-authorized BNSF to discharge groundwater from a railyard remediation system to the manhole in question, given that BNSF complied with the requirements of Chapter 4.04, Public and Private Sewer Drains. According to this chapter, an engineer from the City may impose additional requirements; however, the City has not imposed any additional conditions (11703-11715 BNSF [Glendive]). Title V, *Public Works*, Chapter 51, *Sewer and Water* Systems, Subchapter K, Special *agreement and/or agreements* states that "*No statement contained in this section shall be construed as preventing any special agreement or arrangement between the city and any industrial concern whereby an industrial waste of unusual strength or character may be accepted by the city for treatment, subject to payment therefor by the industrial concern.*" It is therefore my opinion that this remediation system discharge complied with City requirements.

The remediation system had two distinct system components, one for depressing the groundwater table to create a downward gradient for petroleum product collection, and the second for capturing and containing petroleum product from the surface of the groundwater table. Historically, petroleum products removed by the remediation system were stored in an onsite tank temporarily, pending disposal at an approved facility by a specialized contractor. The groundwater depression component of the remediation system operated by pumping groundwater from several feet below the water surface (below the area where petroleum product accumulates) and discharging through a separate pipe to the City's sanitary sewer, terminating at the manhole in question. City's approval of this discharge was memorialized under the July 10, 2002 authorization letter (11703-11715 BNSF [Glendive]).

# Opinion No. 6

With respect to the former IWWTP, BNSF had a demonstrated history of monitoring its discharge to the City's sanitary sewer system and reporting the findings to the City, as required by the former discharge permit associated with the BNSF IWWTP. Although the IWWTP discharged through a separate connection to the City's sanitary sewer system (located along Merrill Avenue [Figure 1]), the history of discharge from the IWWTP under that permit provides clear evidence of BNSF's willingness and ability to ensure compliance with City, state, and federal regulations and correct any deficiencies observed.

BNSF's IWWTP permit included monitoring and reporting requirements, which were documented in the discharge monitoring reports submitted to the City between 2014 and 2021. The City explicitly authorized BNSF to discharge treated wastewater from the onsite WWTP through a designated outfall into the City sewer system, located along Merrill Avenue (Figure 1). This authorization was an integral part of the agreement and demonstrates the City's confidence in BNSF's ability to operate the WWTP within regulatory requirements.

The industrial WWTP discharge permit outlined specific sampling parameters to monitor for compliance with City requirements which were established to protect City's sanitary sewer system, including the City's water treatment plant. The parameters required to be monitored and adhered to under the prior discharge permit included:

- Oil & Grease Limit: 100 mg/L
- pH Limit: <5.0 standard units (s.u.) or >9.0 s.u.
- Total Suspended Solids (TSS): At City of Glendive's discretion

BNSF was required to submit discharge monitoring reports to the City detailing the bimonthly sampling results for these parameters. From May 2014 through January 2021 (i.e., the time of IWWTP decommissioning), BNSF fulfilled the requirements of its permit with the City. Throughout this seven-year period of IWWTP operations,

Expert Report

there were no exceedances of oil and grease or pH. Additionally, BNSF did not receive any notice of violation or other communications regarding TSS exceedances from the City.

BNSF has a longstanding history of engaging the City to ensure compliance with local regulations and maintain best practices in IWWTP operations. This collaboration began as early as 1996, when BNSF involved the City in its IWWTP design process. BNSF submitted the design plans to the City for review, input, and comments, demonstrating a proactive and cooperative approach to environmental management.

The IWWTP construction was completed in 1999, incorporating recommendations from the City. Notably, the project included stormwater segregation, which was specifically suggested by the City to enhance environmental protection and minimize the risk of contamination. This collaborative effort highlights BNSF's commitment to working with local authorities to ensure the WWTP met all regulatory and operational standards (2213-2214 BNSF [Glendive]).

BNSF's demonstrated adherence to the monitoring and reporting requirements, as well as its proactive engagement with the City, demonstrates its commitment to regulatory compliance.

# Opinion No. 7

In prior instances of incidental/accidental discharge to the City's sanitary or stormwater sewer systems, BNSF was expeditious in remedying the situation, relying on its network of consultants and emergency response contractors.

In 1999, 2000, and 2004, there were four separate flooding events in Glendive that affected the ABC Little League ball field, located north of the BNSF facility on North Meade Avenue. The flooding events caused stormwater to enter the City's sanitary sewer system and overwhelmed the City's sanitary lift station. This caused water to back up in the City's sanitary sewer system and daylight at the ABC ball fields. BNSF conducted emergency response actions following all these flooding events.

These flooding events and BNSF emergency responses are summarized in the Remedial Investigation Report (37859-38183 BNSF (Glendive)).

# Opinion No. 8

In 2025, I conducted a site visit of the BNSF railyard in Glendive, Montana and I visually inspected the Work Equipment Building, the railyard remediation system, and on-site manholes between the Work Equipment Building and the former City manhole at South Pearson Avenue and East Valentine Street, and the surrounding area. I observed that the Work Equipment Building was well-maintained and contains no floor drains in the shop area. The only piping connections to the City's sanitary sewer system from the Work Equipment Building were from sanitary sources (toilets, sinks, a washing machine, an ice machine, and a bathroom floor drain). I inspected the basement of the Work Equipment Building and saw no signs of staining commonly associated with petroleum products and I did not detect any petroleum odors. The condition of the Work Equipment Building suggested good housekeeping practices are utilized.

In the basement of the Work Equipment Building, I observed a sump with a sump pump installed. The pump at the time of my visit was configured to allow for pumping to an aboveground tank situated outside the Work Equipment Building. There was no accumulated liquid in the tank, and it does not appear that the sump pump has discharged to this tank since it was installed in 2024. It is my understanding that improvements were made to the

Expert Report

Work Equipment Building, such as sealing up old windows and other building openings, to mitigate intrusion from runoff during snowmelt and rain events. These improvements appear to have addressed water intrusion in the basement as there were several months of relatively significant precipitation, based on my review of weather data from the Dawson Community Airport (United States Department of Commerce 2025), since the improvements were implemented and there did not appear to be water accumulation in the Work Equipment Building basement at a level that required operation of the sump pump.

Additionally, in reviewing the Remedial Investigation Report (37859-38183 BNSF [Glendive]), I observed that a number of offsite properties adjacent to the railyard were identified as having basement sumps. The use of basement sumps at multiple properties in the area indicates that at times when groundwater levels are high, it is necessary to operate the sump pumps to mitigate water intrusion, and that the Work Equipment Building is not unique in having a sump. I reviewed groundwater elevations for monitoring MW-29, which is adjacent to the Work Equipment Building (Figure 1 and Appendix C) and it appears that the water table is generally at its lowest point between approximately November and April, at a depth below ground surface between 8 and 11 feet. At this depth, the groundwater would be expected to be below the floor level of the Work Equipment Building basement and unlikely to trigger the sump pump.

Lastly, I reviewed utility drawings from historical reports to determine whether there was any possible connection between the Locomotive Shop and the Work Equipment Building (Figure 1). Based on my review of those documents and as confirmed during my observations at the railyard during my site visit, I found no indication that these two structures are connected. My assessment confirmed that the manhole in question received input only from BNSF's sanitary sewer line originating from the Work Equipment Building and from the railyard remediation system. I observed that the railyard remediation system had been shut down and its discharge pipe had been capped by BNSF on the railyard property.

# Summary

In reviewing the documents and information provided by the City and BNSF for this case, and as summarized in my opinions above, I have seen nothing to suggest the existence of conditions that would warrant immediate termination of the BNSF sanitary sewer connection without notification or following the protocol outlined in City's Code. Additionally, I have seen no evidence from the City to suggest that the discharge in December 2023 or February 2024 was different in quality or quantity than historical discharges from the railyard as allowed by the City.

# Attachments

Figure 1 – Sanitary and Industrial Line Locations

Appendix A – Resume of Alois Kostelnik

Appendix B – Documents Reviewed

Appendix C – MW-29 Hydrograph

Expert Report

# References

United States Department of Commerce. 2025. National Weather Service. https://forecast.weather.gov/data/obhistory/KGDV.html

United States Environmental Protection Agency. 2023. Region 4. Laboratory Services and Applied Science Divisions, Athens, Georgia. *Operating Procedure: Wastewater Sampling*. April 22.

Violet Fisher (BNSF). Interview. July 8, 2025.

# Figure



Service Layer Credits: World Imagery (Clarity): Source: Esri, Maxar, Earthstar Geographics, IGN, and the GIS User Community

**Utility Lines (Dashed where Abandoned)**

— Industrial Wastewater
— Sanitary Sewer
—○— Storm Drain & Catch Basin
— Water

**Notes:**
1. Locations are approximate.





0 ——— 215
Scale: Feet

**KJ** Kennedy Jenks

Burlington Northern Facility
Glendive, Montana

**Sanitary and Industrial
Line Locations**

2599109*32
Figure 1

Coordinate System: NAD 1983 StatePlane Montana FIPS 2500 Feet    Projection: Lambert Conformal Conic

# Appendix A

**Resume of Alois Kostelnik**

ARCADIS



# Alois Kostelnik

## Technical Expert

Alois Kostelnik is a mechanical engineer with 33 years of experience in design, implementation, and testing of industrial fueling and wastewater treatment systems; modeling and design management of water, wastewater, fuel pumping and other piping systems; and preparation and oversight of engineering design drawings and specifications. He also has experience inspecting the construction of railroad locomotive maintenance and fueling facilities, industrial wastewater collection systems, and storage and treatment facilities, and supervising treatment system commissioning to ensure systems operate as designed, meet performance requirements, and are ready for full operation. Mr. Kostelnik is a Registered Professional Engineer in 10 states and Washington, D.C.

## Key Information

### Education
B.S., Mechanical Engineering, Montana State University, 1991

### Professional Licenses & Certifications
Registered Professional Engineer—IA, LA, MA, MT, ND, NV, OK, PA, TX, WA, and Washington, D.C.

### Years of Experience
Total—33
With Arcadis—13

### Professional Association
American Railway Engineering and Maintenance-of-Way Association (AREMA), Chair of AREMA Committee 6— Rail Facilities, Utilities and Buildings

## Project Experience

### BNSF

#### Sanitary Sewer Replacement
**Glendive, MT**
As the on-site engineer, observed contractors performing video inspection of a portion of the BNSF sanitary sewer line extending across the railyard to connect to the city sanitary sewer system, prepared the design of the replacement line, and provided contractor oversight during construction. This work was performed in 2001.

#### Industrial Wastewater Treatment System Decommissioning
**Glendive, MT**
Provided senior design support and quality assurance review for the decommissioning design of a railyard industrial wastewater system. This work was performed between 2020 and 2021.

#### Industrial Wastewater Treatment System Design
**Various Facilities**
Designed and managed construction of various railyard industrial wastewater collection and treatment systems for maintenance and fueling operations, with tasks including designing complete refurbishment of existing wastewater treatment plants and appurtenances such as a refurbished sedimentation basin; dissolved air flotation treatment plant process, above ground used oil tanks, oil–water separators and equalization tanks; modeling pump and piping system designs; managing permitting for an underground oil storage tank piping closure; coordinating track time and multiple work crews; inspecting vendor-furnished equipment prior to shipment to the site; supervising on-site construction personnel and observing construction; and providing on-site direction of facility commissioning.



### Sanitary Sewer Collection System Assessments
**Various Facilities**
Reviewed sanitary sewer inspection videos identify system connection locations and defects for repairs and replacement.

## Other Clients

### Industrial Wastewater Treatment Facility Upgrades
**Confidential Client, Moose Jaw, Saskatchewan, Canada**
Designed and managed construction of industrial wastewater treatment facility upgrades and systems to process wastewater from maintenance and fueling operations, designed dissolved air flotation treatment plant process and layout, modeled pumps and piping systems design, supervised on-site construction personnel, and provided on-site direction of facility commissioning.

**Confidential Client, Carson, CA**
Designed and managed construction of industrial wastewater treatment facility upgrades and systems to process wastewater from maintenance and fueling operations, designed dissolved air flotation treatment plant process and layout, modeled pumps and piping systems design, designed a new oil–water facility and improvements to an existing used oil tank and equalization tank, supervised on-site construction personnel, and provided on-site direction of facility commissioning.

### Industrial Wastewater Treatment Plant Design and Construction
**Confidential Client, Golden, British Columbia, Canada**
As Project Manager and Design Lead for the design and construction of a new complete industrial wastewater treatment system to process wastewater from locomotive and railcar maintenance and fueling operations, led the design and specification of the dissolved air flotation treatment system plant process and layout, conducted modeling for lift station pumps and piping design, and led on-site startup and commissioning. The upgrade included aboveground storage tanks for wastewater and used oil. Additional activities consisted of acting as the owner's agent for procurement of long-lead process equipment and tanks, supervision of on-site construction observation personnel, on-site direction of facility commissioning.

### Locomotive Fueling Facility Design and Construction
**Confidential Client, Davenport, IA**
As Project Manager and Design Lead for the design and construction of a complete locomotive fueling facility using existing storage and dispensing, led the project from concept through design, construction, startup, and commissioning.

### Railcar Maintenance Facility Design
**Confidential Client, Buffalo, NY**
Provided technical support for the design of a railcar maintenance facility project, technical oversight of the design for rail operations requirements, and overall quality assurance review of the plans.

### Design and Construction of Rail Yard, Locomotive Maintenance and Fueling Facilities
**Confidential Client, Homestead, IA**
As Project Manager and Lead Engineer, led the design and construction of a complete railyard with all ancillary facilities and utilities from concept through construction, startup, and commissioning. Project facilities included a fire pond and pumping system; water, gas, electricity, and phone service extension to the site; a sanitary lift station and force main; storm water collection system and outfall; and locomotive maintenance facility including wash, industrial wastewater collection and treatment, and locomotive fueling facility with fuel storage and dispensing.

### Industrial Wastewater Treatment Systems Assessments
**Confidential Client, CA, IA, MN, MO, TX**
Conducted visual inspections of existing industrial wastewater treatment systems that support railroad fueling and maintenance operations and prepared detailed reports of findings and recommendations to client for improvements.



### Jacking System Design and Construction at Railcar Maintenance Facility
**Confidential Client, Conway, PA**
Designed and managed construction of a jacking pit refurbishment including new jacks for the existing railcar maintenance facility, developed specifications for the facility jacking system, and provided oversight during startup and commissioning.

### Industrial Systems Design and Construction
**Cogema Engineering Services, Hanford, WA**
Performed design, installation, testing, and operation for facility upgrades and portable support equipment; compressed instrument air systems for instrumentation monitoring waste in underground radioactive waste storage tanks; and a Safety Class 2 emergency generator for systems monitoring underground radioactive waste storage tanks. Also performed specification, procurement, and testing of over $1 million of equipment including trailer-mounted 1,500-gallon liquid nitrogen dewars with vaporizers; 120-cubic-feet-per-minute breathing air supply systems; 150-kilowatts diesel generators; and electrical distribution systems to support collection of samples of radioactive waste. Additional activities included fabrication, testing, and operation of four portable radioactive waste tank exhaust systems with high efficiency particulate air (HEPA) filtration and radioactive emissions monitoring systems.

# Appendix B

**Documents Reviewed**

**DOCUMENTS REVIEWED**

1. BNSF's Amended Complaint
2. City of Glendive's Answer to Amended Complaint
3. BNSF and City's Preliminary Pretrial Statements
4. BNSF and City's Initial Disclosures
   a. BNSF 1-44
   b. City 1-763
5. 015 2024.09.17 Scheduling Order
6. 2024.10.25 Dfs Responses to Plfs First Interrogatories
7. 2024.11.15 Dfs Resps to First Requests for Production (CITY 764-1624)
8. 2025.01.03 BNSFs First Supplemental Rule 26 Initial Disclosures
9. 2025.02.07 BNSF's Second Supplemental Rule 26 Initial Disclosures
10. 2025.05.27 BNSF's Third Supplemental Rule 26 Initial Disclosures (037859-089164)
11. 2025.06.11 BNSF's Fourth Supplemental Rule 26 Initial Disclosures (089165-89480)
12. 2025.06.20 BNSF's Fifth Supplemental Rule 26 Initial Disclosures (089481-089620)
13. 2025.06.26 BNSF's Sixth Supplemental Rule 26 Initial Disclosures (089664-089667)
14. 2025.01.07 Defendant's First Supplemental Responses to Plaintiff's First Requests for Production (CITY 1493-1518)
15. 2025.02.07 BNSF's Responses to City's 1/10/2025 First Requests for Admission
16. 2025.03.05 City's Responses to BNSF's Second Requests for Production (CITY 1519-1600)
17. 2025.03.10 BNSF's Responses to City's First Interrogatories
18. 2025.03.10 BNSF's Responses to City's First Requests for Production (BNSF 00045-12035)
19. 2025.03.19 City's Second Supplemental Responses to BNSF's Requests for Production (CITY 01601-01624)
20. 2025.05.28 City's Third Supplemental Responses to BNSF's First Requests for Production (CITY 1625-1716)
21. BNSF's Supplemental Production Documents (BNSF 037854-089164; 090039-090240)
22. City Videos produced 6/20/25 (CITY 1717-68)
23. Deposition Transcript-Frank Ceane (rough draft)
24. 2025.07.16 Defendant's Responses to Plaintiff's First Requests for Admission
25. Baranko 0315-0323
26. 2025.06.34 Ltr from County Sanitarian
27. Summary/Compilation of 2024 data
28. Groundwater elevation data
29. Summary/Compilation of City DMR information

# Appendix C

**MW-29 Hydrograph**



Arcadis U.S., Inc.
17 1st St NW
Choteau
Montana 59422
Phone: 406 466 5930
Fax:
www.arcadis.com

Arcadis. Improving quality of life.