# EXHIBIT E

```
         IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MONTANA

                 BILLINGS DIVISION
```

BNSF RAILWAY COMPANY,

       Plaintiff,

       vs.                              Cause No.

CITY OF GLENDIVE,                        Cv-24-81-BLG-SPW-TJC

       Defendant.

              THE DEPOSITION

             OF SCOTT EMERICK

_____

       BE IT REMEMBERED, that the deposition upon oral examination of SCOTT EMERICK name, appearing at the instance of the Plaintiff, in Billings, Montana on October 1, 2025, beginning at the hour of 9:01 A.M. MDT pursuant to the Federal Rules of Civil Procedure, before Mary (Rainey) Stockton, Certified Shorthand Reporter and Notary Public.

Scott Emerick
ROUGH DRAFT

```
 1                   A P P E A R A N C E S
 2   For the Plaintiff:
 3          NIGHT, NICASTRO, MacKAY, LLC
 4          BY:  ANTHONY M. NICASTRO
 5          27 Shiloh Road
 6          Suite 10
 7          Billings, Montana  59106
 8          nicastro@knightnicastro.com
 9
10   For the Defendant:
11           MOUTLTON BELLINGHAM, PC
12          BY:  ADAM WARREN
13               KETURAH SHAULES
14          27 North 27th Street, Suite 1900
15          P.O. Box 2559
16          Billings, Montana  59103-2559
17          adam.warren@moultonbellingham.com
18
19
20
21
22
23
24
25   ALSO PRESENT:  #, ^ Via Zoom
```

2

Scott Emerick
ROUGH DRAFT

```
 1   have electronically signed this report?
 2         A.  It might have been in July.
 3         Q.  Okay.
 4         A.  I think, offhand.
 5         Q.  Does this report contain all of the opinions
 6   that you intend on offering in this case?
 7         A.  Yes.
 8         Q.  Okay.  Have you performed any work other than
 9   reviewing some documents before this deposition and
10   showing up for this deposition?
11             Have you performed any work since authoring
12   this report?
13         A.  No.
14         Q.  Have you reviewed any materials that might
15   have been produced or created since authoring this
16   report?
17         A.  No.
18         Q.  Okay.  So, let's kind of go through Exhibit B
19   on this report.
20             So, Page 3.  One of the things that I don't
21   see mentioned in here is any deposition testimony.
22             Have you reviewed any sworn testimony in this
23   case?
24         A.  I'm trying to think offhand.  I don't think
25   there was any included in any of the correspondence I
```

36

Scott Emerick
ROUGH DRAFT

```
 1  received.  Yeah, I don't think there was any sworn
 2  testimonies or anything.
 3          Q.  Okay.  So, for instance, May or June -- I
 4  can't remember exactly which month it was -- we took the
 5  30(b)(6) deposition; and the individual identified was
 6  the Public Works Director, Frank Ceane.  You haven't
 7  actually --
 8          A.  Oh, I did see that.  Now that you mention
 9  that, I do believe I saw that.
10          Q.  Okay.
11          A.  That was part of the correspondence in there
12  that I reviewed.
13          Q.  When you say "part of the correspondence" --
14          A.  I received a lot of material.
15          Q.  Yeah.
16          A.  To wade through it -- beg my ignorance -- it's
17  been awhile since I did it, you know, back in July; so,
18  I have to refresh my memory.
19              But I'm not 100 percent sure of everything I
20  reviewed, but I do recall seeing something -- some
21  testimony from Frank where you deposed him.  I did
22  review that.
23          Q.  Okay.  Did you ever see the deposition notice
24  for your deposition?
25          A.  What do you mean?
```

37

Scott Emerick
ROUGH DRAFT

```
 1        Q.  We sent a notice to the attorneys of your
 2   deposition.  Were you ever provided a copy of it?
 3        A.  No.
 4        Q.  Okay.  One of the things we asked for is for
 5   you to bring your file and produce your file with us.
 6            And I see you've come to this deposition
 7   without anything; is that correct?
 8        A.  That's correct.
 9        Q.  Okay.  So, Exhibit B, though, do you see
10   anywhere mentioned in Exhibit B where --
11            Well, first of all, Frank Ceane's deposition
12   isn't even listed.
13            Is it listed anywhere in Exhibit B?
14        A.  Unless it's under one of these others here.
15   It encompasses some of that material.  I don't know.  I
16   don't show it.  I don't see where it's specifically
17   called out in Items A through N, but it could be part of
18   one of those, I guess.
19        Q.  Okay.  And I'll represent that it's not; those
20   are just discovery responses and pleadings.
21            But when you say "correspondence," what
22   correspondence did you review?
23        A.  Keturah sent me a package of several different
24   things with the photos, the videos.  Any written
25   correspondence, which would have been this deposition
```

38

Scott Emerick
ROUGH DRAFT

```
 1  that you're speaking of.
 2       Q.  Okay.  So, when you say:  All photographs
 3  taken at the site of the incident, what photographs did
 4  you look at?
 5       A.  Oh, God, there was a lot of them.
 6           When they were digging things up.  The site
 7  itself.  I mean, there was a lot of photographs.
 8       Q.  Okay.  And Letter B, it says:  The test
 9  results.  What was that that you reviewed?
10       A.  I believe that was from a consultant that was
11  testing the soil in that area.
12       Q.  And who was that consultant?
13       A.  I think it was Terracon.  I'm not -- it's been
14  awhile since I looked at all this stuff.  I believe it
15  was Terracon.
16       Q.  Any other testing results that you looked at?
17       A.  I don't know if there were two testing firms.
18  There might have been two testing firms involved.  The
19  Plaintiff might have hired somebody, as well, to test.
20  I don't recall that.  I do remember one, at least.
21  There might have been another one.
22       Q.  Okay.
23       A.  Again, it's been awhile since I looked at
24  this.
25       Q.  Right.  Well, we asked you to bring your file
```

39

Scott Emerick
ROUGH DRAFT

```
 1   to your deposition and you didn't bring it, so --
 2        A.  No, I didn't know.  I didn't get that
 3   information.
 4        Q.  Okay.  So, where's your office located?
 5        A.  I don't have an office.  My home.
 6        Q.  Okay.  So, you keep all your stuff back at
 7   your home?
 8        A.  Yeah.
 9        Q.  Okay.  So, you don't know, when you formulated
10   your opinions in Exhibit A, whether or not you reviewed
11   testing other than Terracon's testing.
12        A.  Yeah.  There might have been another firm
13   involved, as well.
14        Q.  Okay.  And when I read your report in Exhibit
15   A, you don't make reference to any sworn testimony from
16   Frank Ceane.  I don't see any citations anywhere in
17   here.
18            Do you know whether or not you reviewed his
19   deposition at all before you even authored your report?
20        A.  I believe I did.  I believe it was part of the
21   package that I received.
22        Q.  Okay.  How many hours have you billed to the
23   City of Glendive?
24        A.  I just gave Keturah a bill for six hours.
25        Q.  And is that all the work that you've done on
```

40

Scott Emerick
ROUGH DRAFT

```
 1   this case?
 2        A.  Yes.
 3        Q.  How many pages of documents have you been
 4   provided in this case?
 5        A.  I don't know.  I don't have my file.  Again, I
 6   didn't know you wanted me to bring that.  There was
 7   quite a volume of material to review.
 8        Q.  So, when I'm looking at C through L, those are
 9   legal pleadings, which lots of times have exhibits that
10   are also produced in response to those pleadings.
11            And, you know, I'll represent to you at one
12   point the city filed a motion saying that we've produced
13   100,000 pages of documents in this case.
14            Do you think you've received all of those
15   pages?
16        A.  100,000?
17        Q.  Yeah.
18        A.  No.
19        Q.  Okay.
20        A.  I reviewed quite a few, but I don't think it
21   numbers to 100,000.
22        Q.  Okay.  What's your best ballpark of, roughly,
23   how much material you actually reviewed before doing
24   your report?
25        A.  Including photographs and everything?
```

41

Scott Emerick
ROUGH DRAFT

```
 1          Q.   Yes, sir.
 2          A.   Oh, geez, I would say upwards of 100.
 3          Q.   Okay.  Well, I mean, I've got a notebook here
 4   that has --
 5          A.   Photographs.
 6          Q.   -- City 1 through City 400-and --
 7          A.   Well, I could be off.
 8          Q.   400-and-90 --
 9          A.   That's just the photographs.
10          Q.   This is just the first round of photographs,
11   sir.
12          A.   Yeah.
13          Q.   We haven't even gotten to the videos yet.
14          A.   Yeah.
15          Q.   490-something -- 492-ish.  Were you provided
16   all these photographs?
17          A.   Yes, I believe so.
18          Q.   Okay.
19          A.   There was a lot of photographs.
20          Q.   I took about an eight-hour deposition of
21   Frank; and you said you reviewed that, too.
22          A.   Yeah.
23          Q.   So, how did you break down the six hours that
24   you spent?
25          A.   Looking at all of that.  I didn't break it
```

42

Scott Emerick
ROUGH DRAFT

```
 1   down.  I just gave them a -- because it took me six
 2   hours, I mean, to go through everything and formulate a
 3   report.
 4        Q.  Okay.  Do you have electronic versions or hard
 5   copies of everything that they provided to you?
 6        A.  Electronic.
 7        Q.  Electronic.  Okay.  Saved on your hard drive?
 8        A.  Yes.
 9        Q.  The other thing that you looked at was the
10   City of Glendive DEQ permit.
11        A.  Yes.
12        Q.  Was that something that you were provided?  Or
13   did you have to find that on your own?
14        A.  I was provided that.
15        Q.  Okay.  And then a copy of the City of Glendive
16   Code, is that something that you reviewed?
17        A.  Yes.
18        Q.  Okay.  So, we've taken, you know, I mean, at
19   least a dozen, maybe even more, depositions in this
20   case.
21             At least half of them are actual city utility
22   workers who were boots-on-the-ground in December and in
23   February of 2024.  December 2023 and February of 2024.
24             I take it you haven't actually reviewed their
25   sworn testimony?
```
43

Scott Emerick
ROUGH DRAFT

```
 1        A.  I'm trying to think.  There was two guys that
 2   were mentioned, but I think that was just mentioned in
 3   Frank's.  Two gentlemen that were maybe, say, his
 4   employees or he supervised them.
 5        But I don't believe I reviewed a deposition on
 6   either one of those guys.
 7        Q.  Okay.
 8        A.  I think they were just mentioned in his.
 9        Q.  Is it your understanding that Frank Ceane
10   actually never laid eyes on the East Valentine
11   manhole -- the manhole we're going to be talking
12   about -- at any point in time that's relevant for this
13   case?
14        A.  I don't know.  I couldn't answer that, if
15   he --
16        You mean did he physically go out to the site?
17        Q.  Yeah.
18        A.  I don't know.  That wasn't mentioned in there,
19   in anything that I saw.
20        Q.  Well, I took his deposition for eight hours
21   and I asked him whether or not he went out there and --
22        A.  Oh, that was in there?
23        Q.  Yeah.
24        A.  If he said "no," then I've got to assume he
25   didn't go out.
```
44

Scott Emerick
ROUGH DRAFT

```
 1         Q.   Okay.  So, if --
 2         A.   Again, bear with me.  It's been awhile since I
 3   looked at the specifics of it.
 4         Q.   Yeah.  So, it sounds like when you wrote your
 5   report, you're telling me you had Frank's deposition.
 6              But if Frank wasn't somebody who actually went
 7   out there and looked at the manhole and had any personal
 8   knowledge about what was going on with the manhole, but
 9   other people did -- and we've deposed them since then --
10   it sounds like you haven't actually been provided with
11   their sworn testimony of what they saw and what they
12   didn't see.
13              MR. WARREN:  Objection.  Argumentative.
14         Q.   (BY MR. NICASTRO)  Is that fair, sir?
15         A.   Yeah, that's fair.  Yeah.  Again, I believe
16   there's two gentlemen that were involved that were
17   mentioned, I think, in his deposition that were his
18   employees that were, like you mentioned,
19   boots-on-the-ground.
20         Q.   Okay.  In preparing for your report, did you
21   ever ask the people that hired you:  Can I talk to these
22   utility workers so that I can gain some information
23   about what they saw?
24         A.   No.
25              MR. WARREN:  I'll object to the extent this
```

45

Scott Emerick
ROUGH DRAFT

```
 1  invades the work product privileges protected under the
 2  Rules of Federal Civil Procedure.
 3          Any conversations or discussions that he's had
 4  with us is protected from disclosure on that.
 5      Q.  (BY MR. NICASTRO)  Well, let me ask it this
 6  way:  Did you request to talk to any of the city utility
 7  workers who actually were boots-on-the-ground when this
 8  incident was occurring?
 9      A.  When it was occurring?
10      Q.  Well, the people that were there when it
11  happened.  Did you actually --
12          Did you request to talk to them so that you
13  could gain information about what they saw and what they
14  didn't see?
15      A.  No.
16      Q.  Okay.  Why not?
17      A.  I had the report and their statements were in
18  some of that material in the deposition -- or whatever
19  -- of Frank.  I didn't feel that there was a need to
20  talk with them.  I had everything right there that was
21  written.
22      Q.  I'm sorry.  You said "in the statement."  What
23  statements are you --
24      A.  I think the two -- there was two gentlemen
25  that were involved -- again, that you mentioned,
```

46

```
 1   boots-on-the-ground -- that report to Frank that were
 2   on-site and their observations were included in the
 3   report or deposition that I received.
 4        Q.  Are you referring to the individuals who went
 5   out after the fact and wrote statements -- typed up
 6   statements?
 7        A.  After the fact?  After the backup?  Or what do
 8   you mean?
 9        Q.  After they had ^ listen  submitted the manhole
10   shut, some individuals from the City of Glendive went on
11   to BNSF property and performed some inspections and
12   typed up some reports.  Is that what you're referring
13   to?
14        A.  I don't know.  I'd have to go back and look
15   and see if --
16            You know, I do remember reading some
17   statements from two individuals; whether it was after
18   the fact, during, I...
19            I think it was part of the report that they --
20   like I mentioned in my report -- that they reported the
21   observation of fuel/oil discharge to the Public Works
22   Director, Frank.
23            And then Frank instructed them to go out and
24   fill the manhole with concrete.
25        Q.  Okay.
```

47

Scott Emerick
ROUGH DRAFT

```
 1        A.  And I think there was two gentlemen's names
 2   that were mentioned -- I don't recall the names -- that
 3   I read in that report.
 4        Q.  All right.  And so, you're telling me that you
 5   wrote your report based on what Frank said that other
 6   people reported back to him.
 7        A.  Yes.
 8        Q.  All right.  But not actually looking at any
 9   sort of sworn statements as to what those individuals
10   actually found when we took their deposition.
11        A.  Correct.
12        Q.  All right.  And were you ever provided with
13   the city sewer inspection reports?
14        A.  I believe I was.  I believe it was part of
15   that package I received.
16        Q.  Okay.  When did you receive the sewer
17   inspection reports?
18        A.  I think it was all part of this information
19   that I received.
20            Again, it's so confusing.  There's so much
21   material in this case; between the reports and the
22   photographs.  It's hard to say exactly what I did
23   receive.  I'd have to go back and look at my records.
24            To pick out one document out of -- like you
25   said -- hundreds, it's hard to recall, sitting here.
```

48

Scott Emerick
ROUGH DRAFT

```
 1              MR. WARREN:  Anthony, when we get to a good
 2    stopping point, can we get a refill on coffee?
 3              MR. NICASTRO:  Yeah.  Let me just ask this one
 4    question here.
 5              MR. WARREN:  Okay.
 6         Q.   (BY MR. NICASTRO)  And this might be really
 7    kind of significant with where we go with this
 8    deposition.
 9              The weekly manhole inspection reports were not
10    produced to us until July 24 of 2025.
11              And your report is, apparently, signed the
12    week before then.
13              So, I guess what I'm getting at is:  Did you
14    have the weekly inspection reports when you did your
15    report and they were just late produced to us?
16              Or is it possible you never even had the
17    weekly inspection reports when you did your report?
18         A.   Again, I would have to go back and look at the
19    material I received to see if I did have those.
20         Q.   Okay.
21              MR. NICASTRO:  Let's go ahead and take that
22    break and let's have a conversation off the record while
23    we do that.
24              (A recess was taken from 10:00 A.M. MDT
25    to 10:13 A.M. MDT)
```

49

Scott Emerick
ROUGH DRAFT

```
 1          MR. NICASTRO:  Back on the record.
 2     Q.   (BY MR. NICASTRO)  During the break, Counsel
 3  had represented to me that they actually didn't send you
 4  Frank's deposition.
 5          So, with that representation, then it sounds
 6  like you did not review his depo before making your
 7  report.
 8     A.   I believe I had it confused with all that
 9  information that I had.  Yep.  I mean, I got a lot of
10  information, as you well know, mentioning that 400-plus
11  photographs.
12     Q.   Okay.
13          MR. NICASTRO:  So, the other thing I want to
14  mark as Deposition Exhibit 2 to your deposition is a
15  copy of what the city produced to me as the city code.
16               (Exhibit No. 2 marked.)
17     Q.   (BY MR. NICASTRO)  Does this look like -- this
18  is listed on your referenced relied on material.
19          Does this look like something that you
20  reviewed, as well?
21     A.   Yeah.  That Item N in Exhibit B?
22     Q.   Yes, sir.
23     A.   I believe it's Item N.
24     Q.   Yes, sir.  Okay.  So, you did have this when
25  you did your report.
```

50