# EXHIBIT F

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF MONTANA
 3                       BILLINGS DIVISION
 4   _____
 5   BNSF RAILWAY COMPANY,
 6            Plaintiff,
 7      vs.              Cause No. CV 24-81-BLG-SPW-TJC
 8   CITY OF GLENDIVE,
 9            Defendant.
10   _____
11               VIDEOCONFERENCE DEPOSITION UPON
12                     ORAL EXAMINATION OF
13                         JAKE CAREY
14   _____
15           BE IT REMEMBERED, that the deposition
16   upon oral examination of JAKE CAREY, appearing at
17   the instance of Plaintiff, was taken in the
18   conference room of the Holiday Inn Express &
19   Suites Glendive, 1919 North Merrill Avenue,
20   Glendive, Montana, on Monday, July 28, 2025,
21   beginning at the hour of 11:20 a.m., pursuant to
22   the Montana Rules of Civil Procedure, before Kasey
23   L. Fisher, Registered Professional Reporter -
24   Notary Public.
25
```

Page 2

```
 1
 2            APPEARANCES
 3  ATTORNEY APPEARING ON BEHALF OF THE
    PLAINTIFF, BNSF RAILWAY COMPANY:
 4
         Mr. Anthony Nicastro, Esq.
 5       Knight Nicastro MacKay, LLC
         27 Shiloh Road, Suite 10
 6       Billings, Montana 59106
         nicastro@knightnicastro.com
 7       (Present via Zoom)
 8            and
 9       Ms. Brooke Kuhl, Esq.
         BNSF Railway Company
10       P.O. Box 16090
         Missoula, Montana 59808
11       brooke.kuhl@bnsf.com
         (Present via Zoom)
12
13  ATTORNEY APPEARING ON BEHALF OF THE
    DEFENDANT, CITY OF GLENDIVE:
14
         Ms. Keturah Shaules, Esq.
15       Mr. Adam Warren, Esq.
         Moulton Bellingham PC
16       27 North 27th Street, Suite 1900
         P.O. Box 2559
17       Billings, Montana 59103-2559
         keturah.shaules@moultonbellingham.com
18       adam.warren@moultonbellingham.com
         (Present at Holiday Inn, Glendive)
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  EXAMINATION OF MR. JAKE CAREY BY:          PAGE:
 3       Mr. Anthony Nicastro, Esq.............4
 4       Mr. Adam Warren, Esq..................78
 5            E X H I B I T S
 6  DEPOSITION EXHIBITS:                       PAGE:
 7            (NONE)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1  WHEREUPON, the following proceedings were had
2  and testimony taken, to-wit:
3           * * * * * * * *
4           JAKE CAREY,
5  called as a witness herein, having been first duly
6  sworn, was examined and testified as follows:
7           EXAMINATION
8  BY MR. NICASTRO:
9  Q.  Mr. Carey, my name is Anthony Nicastro.
10  I represent BNSF Railway Company.
11      We've met for the first time today,
12  correct?
13  A.  Yes, sir.
14  Q.  Have you ever given a deposition before?
15  A.  I have not.
16  Q.  Okay.  You're under oath, just kind of
17  like you were in court in front of a judge and a
18  jury, giving testimony.
19  A.  Okay.
20  Q.  If you don't understand one of our
21  questions, just let us know, we'll restate it.
22      If you need to take a break at any time,
23  that's fine.  Just ask that you -- just let me
24  know you need to take a break, and we'll take that
25  break.  I just ask that you answer a pending

Page 5

1  question, if we have a pending question.  Okay?
2  A.  Sounds good.
3  Q.  And our court reporter's taking
4  everything down, so we'll try not to speak over
5  each other.  It happens a lot when we're doing
6  these things over Zoom.
7      But if I start asking a question before
8  you're done answering -- giving an answer to the
9  question, just stop me.  Okay?  Because I want to
10  make sure I'm getting a full answer from you.
11  Okay?
12  A.  Yep, sounds good.
13  Q.  All right.  So we got your name.
14      What's your address?
15  A.  73 Dry Creek Road, Glendive, Montana.
16  Q.  What do you do for a living, sir?
17  A.  I am the foreman for the water and the
18  wastewater plant for the City of Glendive.
19  Q.  How long have you had that job?
20  A.  I got hired on initially in 2019, and I
21  believe I've been foreman somewhere in 2020.
22  Q.  What were you doing before then?
23  A.  I was in trade school actually.
24  Q.  Okay.  For what?
25  A.  Water and wastewater treatment.

Page 50

1  X amount of stuff in it is what I was figuring was
2  in the permit.
3        That's all I'm saying, is if we're
4  planning on seeing X amount of volume per day, X
5  amount of concentration, and all of -- you know,
6  this is all assumption, this is all hypothetical,
7  like I said, when I was talking to Frank.  If all
8  of a sudden I'm seeing three times that amount of
9  volume, even at that perceived concentration of
10 whatever the dosage is, that could be harmful to
11 our effluent numbers and stuff, harmful to our
12 process and our -- our results that we need to
13 send in to DEQ.
14    **Q.  Okay.  So were you led to believe that**
15 **this would be different than what they were**
16 **discharging historically under the previous**
17 **permit?**
18    A.  As far as volume, yeah, I believe so.
19    **Q.  Would there be ways though to control the**
20 **volume with BNSF?**
21       **MR. WARREN:** Objection.  Calls for
22 speculation.
23       But go ahead and answer.
24       **THE WITNESS:** Yeah, I don't know their
25 system well enough.

Page 51

1  BY MR. NICASTRO:
2    **Q.  Well, no, I'm not talking about a system.**
3       **This was just -- what was your**
4  **understanding as to what BNSF wanted to do?**
5    A.  They wanted to have a temporary discharge
6  permit for an excess amount of water that they had
7  built up in their system, and that's why they
8  needed the discharge.
9        Like if they didn't have an excess amount
10 of volume on their -- on their property, that they
11 needed to get rid of -- you know what I mean --
12 like if they weren't in a position before where
13 they had this excess and they didn't need the
14 temporary discharge permit, I was assuming that
15 they had an excess amount of volume on their -- on
16 their property, which forced them into a situation
17 where they needed a discharge permit.
18       So in my mind, I was assuming that they
19 were -- they were going to discharge however much
20 more than usual.  That would be what was out of
21 the norm, for me, in my mind.
22    **Q.  Okay.  But I guess what I'm getting at is**
23 **how much more?**
24       **I mean, you were just told they wanted to**
25 **discharge more?**

Page 52

1    A.  Right.  Right.
2    **Q.  Okay.**
3    A.  In my mind, it was perceived to be
4  enough -- enough of an increase in volume that it
5  could be detrimental to our process at the
6  wastewater plant.
7    **Q.  Okay.  And what made you -- what made you**
8  **think that just by someone saying "we've got more"**
9  **that it would be a detriment?**
10   A.  I guess, like I said, if they were in a
11 position and needed a discharge permit at that
12 point, I was just assuming that if it -- if we
13 hadn't got a discharge in however long before
14 then, that we're probably talking a different
15 concentration, and if we haven't got a discharge
16 however months before then, that we're talking a
17 different volume as well.
18      So to me it just seemed like a situation
19 that could go awry at the wastewater plant.
20   **Q.  Well, were you provided any information**
21 **about what they would do to the water before they**
22 **would even discharge it?**
23   A.  No.  All I was going off of is their --
24 my previous knowledge on their dissolved air
25 floatation system, so just normally what they did.

Page 53

1    **Q.  Okay.  And when they -- when they were**
2  **discharging under that, were you aware of any**
3  **issues that it was causing at the wastewater**
4  **treatment plant?**
5    A.  To the best of my knowledge, no.
6    **Q.  Okay.  So if they treated the water and**
7  **discharged it under the same limitations, the same**
8  **exceedance guidelines, whatever they have --**
9  **whatever they previously had -- well, let me ask**
10 **you this.**
11      **Were you told that information?**
12   A.  No.
13   **Q.  In other words --**
14   A.  No.
15   **Q.  Okay.**
16   A.  No, I was not.
17   **Q.  Did you even see the draft permit that**
18 **BNSF was proposing to the City?**
19   A.  No, I didn't.  To the best of my
20 recollection, no, I didn't.
21   **Q.  All right.  So from your standpoint, it**
22 **sounds like it was just out of -- you were more**
23 **concerned with the volume?**
24   A.  Volume and concentration.  Like I said,
25 if it had been sitting there stagnant and now

Page 54

1  we're at a point where we need a discharge permit
2  to get rid of this stuff, and for however many
3  months that it had been sitting stagnant and not
4  getting treated and, you know, doing what the
5  system normally does for as far as I can tell,
6  that was -- that and volume was a concern.
7  Q.  Okay.  And when you say "concentration,"
8  you're talking about what's potentially in the
9  water; is that fair?
10  A.  Yeah.  Yeah.
11  Q.  Okay.  But the way you address what's in
12  the water is through the treatment process that
13  BNSF was proposing to do before it even got into
14  the manhole, into the City system, correct?
15  A.  Correct, as far as -- per the permit,
16  you're saying?
17  Q.  Yes.
18  A.  Yeah, that would be correct.
19  Q.  I mean, that's how you deal with -- how
20  you deal with concentration --
21  A.  Yep.
22  Q.  -- is, well, what are they going to do
23  with the water before it hits our system, right?
24  A.  Yep, absolutely.
25  Q.  And it doesn't sound like you and Frank

Page 55

1  got into the details about what BNSF was planning
2  on doing to the concentration?
3  A.  No.  To the best of my recollection, no.
4  Q.  You just told Frank, I don't think you
5  should do it.
6     Because you had a concern that the
7  concentration -- and the concentration may be
8  something that wouldn't be good for your system
9  and because of the volume?
10  A.  Yep.  Yes, sir.  With the information
11  that I had at the time, yeah.
12  Q.  All right.  And Frank didn't ask you,
13  Well, you know, let's -- I'm negotiating with
14  BNSF.  What is it that would -- that the City
15  should ask BNSF to do to make you feel comfortable
16  about this permit?
17     He never had that conversation with you?
18  A.  To the best of my recollection, no, sir.
19  Q.  All right.  When -- did these car washes,
20  by the way, did they have any sort of extra
21  permits?
22     You mentioned some of these other
23  industrial users.
24  A.  I -- without having the information in
25  front of me, I do not know.

Page 56

1  Q.  Do you know whether or not the City has
2  any other industrial permits, any permits with any
3  other industrial users?
4  A.  Not to my knowledge.  Not to my
5  knowledge.
6  Q.  Sorry.
7  A.  No, you're fine.
8  Q.  What do you recall then about the
9  subsequent Zoom meeting about the permit?
10  A.  I don't -- I don't think I had much to
11  say with it.  If I said anything, I just said that
12  I was worried about the process at the wastewater
13  treatment plant.  I don't -- yeah, it was -- when
14  I'm in the room with the boss man, you know, you
15  know what time it is.
16  Q.  I understand.  How about after that Zoom
17  meeting, do you recall, did anybody have any --
18  did anybody talk with you at all about this permit
19  request?
20  A.  I don't believe so, not much after that,
21  unless it was just a conversation about it's not
22  happening.
23  Q.  Okay.  And when do you recall the permit
24  being denied?
25  A.  I guess I don't.  I don't recall.

Page 57

1  Q.  Did anybody from the City ever tell you
2  that they were monitoring BNSF during this
3  process?
4  A.  No, not that I recall.
5  Q.  Do they keep daily logs at the wastewater
6  treatment plant?
7  A.  Yeah, we -- as -- as far as like local
8  stuff, daily logs as far as like results and stuff
9  end up in a file up at city hall.  But, you know,
10  building temperatures and daily maintenance and
11  stuff, we have a log.
12  Q.  So some of these instances where you were
13  describing about seeing, you know, issues at the
14  wastewater treatment plant that Mr. Carpenter had
15  testified about being a sheen, and you said one
16  about a smell --
17  A.  Yeah.
18  Q.  -- would they be in the daily logs?
19  A.  It would be more than likely -- because
20  at that point we have city hall, you know, in on
21  it.  So it would more than likely just be a
22  narrative the city hall types up with us.
23  Q.  Okay.  It would be a physical document?
24  A.  For like a DMR, like if it's a big
25  enough -- if it's a big enough situation where

```
 1
 2                C E R T I F I C A T E
 3
 4   STATE OF MONTANA      )
                           : Ss
 5   COUNTY OF GALLATIN    )

 6          I, Kasey L. Fisher, Registered
     Professional Reporter and Notary Public for the
 7   State of Montana, residing in Bozeman, do hereby
     certify:
 8
            That I was duly authorized to and did
 9   swear in the witness and report the deposition of
     JAKE CAREY in the above-entitled cause; that the
10   foregoing pages of this deposition constitute a
     true and accurate transcription of my stenotype
11   notes of the testimony of said witness, all done
     to the best of my skill and ability; that the
12   reading and signing of the deposition by the
     witness have been expressly reserved.
13
            I further certify that I am not an
14   attorney nor counsel of any of the parties, nor a
     relative or employee of any attorney or counsel
15   connected with the action, nor financially
     interested in the action.
16
            IN WITNESS WHEREOF, I have hereunto set
17   my hand and affixed my notarial seal on this the
     7th day of August 2025.
18
19
20
21
22
23
24
25
```

Rough Draft